INTER-MARITIME FORWARDING CO., INC. *v.* UNITED STATES (No. 4935) [2]

---

[1] "Through the Customs Maze"—Levett.
[2] C. A. D. 685.

United States Court of Customs and Patent Appeals, June 24, 1958

Allerton deC. Tompkins for appellant.

George Cochran Doub, Assistant Attorney General, Richard E. FitzGibbon, Chief, Customs Section (Mollie Strum and Richard H. Welsh, trial attorneys, of counsel), for the United States.

[Oral argument April 8, 1958, by Mr. Tompkins and Mr. Welsh]

Before JOHNSON, Chief Judge, and WORLEY, and RICH, Associate Judges

WORLEY, Judge, delivered the opinion of the court:

The issue here is whether certain articles should be classified as optical instruments under paragraph 228 (b) or as agricultural implements under paragraph 1604 of the Tariff Act of 1930.

The collector's classification as optical instruments was sustained by the Customs Court. The pertinent provisions of the competing paragraphs read:

Par. 228

\*     \*     \*     \*     \*     \*     \*

(b) \* \* \*, all optical instruments, frames and mountings therefor, and parts of any of the foregoing; all the foregoing, finished or unfinished, not specially provided for, 45 per centum ad valorem.

1604. Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, machinery for use in the manufacture of sugar, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural implements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: Provided, That no article specified by name in Title I shall be free of duty under this paragraph.

The merchandise consists of devices known as "Chixexers," used in making internal optical inspections through the vent or cloaca of chicks to ascertain their sex. The instruments have no other use. Their practical value is summarized in the following excerpt from the court's opinion:

Mr. Rogers, explaining the importance of chick sexing, stated that the poultry industry is divided into two phases, egg production and meat production; that, in the field of egg production, the female chick, of course, is the one that produces the egg, and that it is, therefore, economically necessary to determine which chicks are males, since, if that can be done when they are a day old, the male chicks may be destroyed, thus making very substantial savings in feed, brooding equipment, housing space, and labor. With respect to the broiler industry, the witness stated that the male and female grow at a different rate; that broilers are being raised in flocks of 16,000 to 20,000 birds; that "If one is to go in there when they are ten weeks old, and sort out the 18,000 to 20,000 pullets, it would be quite a job"; but that the birds can be raised in two separate flocks, if they can be sexed beforehand.

It appears there are two methods of chick sexing, one of which involves a so-called "manual" inspection without instruments and

requires extensive training and experience, while the other, involving the use of the instant "Chixexers," requires substantially less training and experience. The former method has been used for many years while the latter is of more recent origin.

If we correctly interpret the opinion of the Customs Court, its denial of classification under paragraph 1604 rests on three grounds: (1) "It is the essential character of the articles in question and their designed use and purpose which we deem controlling;" (2) that the articles do not partake of the nature of those provided for *eo nomine* in that paragraph; and (3) their use "does not in any way improve the particular chick as food or a food producer."

Witnesses called by both parties testified as to the method of using the chick sexers and the customary business occupation of those who use them. The testimony is extensive and, in many instances vague and conflicting, in addition to containing many statements of opinion rather than facts. Despite those defects, however, we think the record fairly establishes that the instruments are used by those engaged in three occupational categories, viz, in commercial hatcheries, by those who raise poultry in conjunction with other agricultural pursuits, and by specialists or experts employed on a contract basis, although it is difficult for us to determine from the record the exact proportion of the instruments used in those respective fields.

The decision of this court most pertinent to the instant appeal is *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395, which was cited and discussed below. That case involved celluloid leg bands of various colors which were applied to the legs of chickens to indicate their age. In holding such bands to be free of duty under paragraph 1604 the court said:

"After much consideration, we are of the opinion that the raising of poultry is an agricultural pursuit in the same sense that the raising of livestock would be. In this view it would be clear that watering troughs and other articles contributing to the health, growth and well being of poultry would be agricultural implements. We also conclude that the celluloid poultry leg bands at bar, used for identification purposes, *serve a purpose in the successful and efficient raising of poultry* and if they were chiefly so used at or immediately prior to the passage of the Tariff Act of 1930 they should be regarded as agricultural in their character. It would seem to be illogical to hold that a chicken trough would be an agricultural implement and that implements used to identify poultry would not be." (Italics supplied).

Although the Customs Court distinguished that case on the theory the leg bands were applied by the poultrymen themselves, while the instant articles are used by experts, we do not think that conclusion is supported by the evidence. To the contrary, there is ample testimony that the instant articles are used to a substantial extent by individuals "who raise poultry as part of a general farm operation," in addition to the so-called contract specialists who do not raise poultry.

With respect to the second ground, it has been held that the doctrine of *ejusdem generis* has no application to paragraph 1604. *W. J. Byrnes & Co.* v. *United States*, 30 C. C. P. A. (Customs) 166, C. A. D. 229, and cases there cited.

In our opinion, the final ground, that the chixexers do not "in any way improve the particular chick as food or as a food producer" is not decisive of the issue. We can see no difference in principle between the leg bands in the *Perry* case and the articles here. In neither case are the instruments designed to, nor do they, "improve" the poultry as food or food producers, yet they do "serve a purpose in the successful and efficient raising of poultry," which is conceded to be an agricultural pursuit. Moreover, wagons and carts, for example, are provided for *eo nomine* in paragraph 1604 as agricultural implements, yet it does not appear they would necessarily "improve" agricultural products *per se*.

We think *United States* v. *Spreckels Creameries, Inc.*, 17 C. C. P. A. (Customs) 400, T. D. 43835, relied on by the Government, is readily distinguishable. There it was held certain metal cans used for transporting milk were not agricultural implements because their chief use was in processing milk after the milk had left the farm and become an article of commerce. The evidence was held to be insufficient to establish that the chief use of the cans was on farms or by farmers, or even by a cooperative organization composed of farmers. Here, however, at least one distinction lies in the fact that the instruments are not only chiefly, but always, used in connection with raising poultry which, as held in the *Perry* case, is an agricultural pursuit. In this connection the following testimony of a witness for appellant is pertinent:

Q. Have you sold this instrument to poultry raisers who raise poultry as part of a general farm operation?

The Witness: Yes. In fact, the majority of them do have that type of operation along with their hatching of the baby chick and nursing it through the brooding period.

If there were any reasonable doubt as to the correctness of our conclusion here, we think it could well be dissolved by the following excerpt, also from the *Perry* case: " * * * the courts have always given agricultural free list provisions like the one at bar, and many other tariff enactments which were intended to benefit agriculture, a very broad and liberal construction so that the evident purpose of Congress especially to favor agriculture might be carried out."

For the reasons given, it becomes necessary to *reverse* the judgment appealed from.

JOHNSON, C. J., was present at oral argument but did not participate in the decision of this case.

O'CONNELL, J., was not present at oral argument but, by consent of counsel, participated in the decision.